NORTHERN DISTRICT OF TEXAS

**FILED**

JAN - 5 2015

CLERK, U.S. DISTRICT COURT

By _____
　　　　　Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PATRICK EVANS,　　　　　　　§
　　　　　　　　　　　　　　§
　　　　Petitioner,　　　　§
　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　§　　No. 4:13-CV-301-A
　　　　　　　　　　　　　　§
WILLIAM STEPHENS, Director,　§
Texas Department of Criminal §
Justice, Correctional　　　　§
Institutions Division,　　　§
　　　　　　　　　　　　　　§
　　　　Respondent.　　　　§

### MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28
U.S.C. § 2254 filed by Petitioner, Patrick Evans, a state
prisoner currently incarcerated in the Correctional Institutions
Division of the Texas Department of Criminal Justice (TDCJ),
against William Stephens, Director of TDCJ, Respondent. After
having considered the pleadings, state court records, and relief
sought by Petitioner, the court has concluded that the petition
should be denied.

## I.　Procedural History

On June 25, 2007, in the Criminal District Court Number Two
of Tarrant County, Texas, Case No. 0989458D, a jury found
Petitioner guilty of capital murder, and he received an automatic

life sentence.   Clerk's R. 90, ECF No. 7-7.   The Eighth Court of
Appeals of Texas affirmed the trial court's judgment, and the
Texas Court of Criminal Appeals refused Petitioner's petition for
discretionary review.   Mem. Op., ECF No. 7-2; *Evans v. State*, PDR
No. 1554-09.   Petitioner also filed a postconviction state habeas
application, which was denied by the Texas Court of Criminal
Appeals, in part, on the findings of the trial court.   SH11c -
writ, Order, 359, ECF No. 10-13.   This federal petition for
habeas relief followed.

The Eleventh Court of Appeals summarized the facts of the
case as follows:

> Melvyn Williams died of multiple gunshot wounds to
> the head.   The forensic pathologist testified that the
> manner of death suggested an execution-style murder.
> The significant facts in the case are controverted.
>
> Wanda Williams is the mother of Mercutio "Kee Kee"
> Howard and the sister of Shirley Tolliver.   She
> testified that Kee Kee and Appellant were long-time
> friends.   Wanda had a house located at 5416 Purington
> in Fort Worth, Texas, but she provided live-in care for
> her grandmother at the City View Apartments.   Wanda
> found Melvyn's body in the storage shed at the
> Purington address.
>
> Wanda's involvement began when she received a
> telephone call from Appellant informing her that he was
> coming to Fort Worth.   She told Kee Kee of Appellant's
> plans.   The next morning, Wanda's nephew, Joseph
> Tolliver, entered her bedroom at the City View
> Apartments and awakened her.   When he told her there
> was a body at her house, Wanda jumped up, grabbed her

keys, and drove to the Purington address.  She noticed drops of blood on the sidewalk as she walked up the driveway.  She entered the house through the back door, walked into the backyard, and discovered the body.  She then contacted a United States Marshall who was a friend of her sister.

### Kee Kee's Version of Events

Kee Kee testified that he met Appellant in high school and they had known each other for more than ten years.  Kee Kee explained that Appellant had moved from Fort Worth to Houston, but he would periodically travel to Fort Worth to visit his friends.  When his mother related that Appellant was coming to Fort Worth, Kee Kee thought it was odd because Appellant had been to Fort Worth only a few days before.  Kee Kee detailed his telephone conversation with Appellant:

> When I walked in the house and the phone
> was ringing and I picked it up.  And
> [Appellant] had told me that he was on his
> way down here and he had a dead body in the
> trunk.  I said: Man, come on.  I didn't
> believe that right there.  So then that's
> when he told me that he was bringing his
> cousin down here from college.  So I believed
> that.  I told him: Well, just meet me at my
> house [5416 Purington].

Kee Kee and Appellant met at the Purington address.  Kee Kee's friend, Courtney Davis, was with him when Appellant arrived in his black Intrepid.  Appellant had marijuana, a big bag of cocaine, prescription drugs, a revolver, and some type of handgun with a pearl handle.  Kee Kee testified that when he and Appellant were alone, Appellant described how he murdered Melvyn:

> Q. While they [Joseph Tolliver and Courtney
> Davis] were gone who was left at the house?
>
> A. Just me and [Appellant].

3

Q. What happened while they were gone?

A. We was talking and that's when he told me how he did it.

Q. What did he say?

A. He said he had-he said he had went up there and it was unusual for whoever this guy is to be up in the house by his self.  So some way he got him to come out and get in the car.

Q. What car?

A. In his black Intrepid.

Q. What happened?

A. He say he got him to come out there and get in the car.  And the guy was sitting on the passenger's side.  And he asked him-some way he got a gun.  I don't know where the gun, how Patrick got the gun or whatever.  I don't I don't know that.  But anyway he told the dude to get something out of the glove compartment.  And he said when the dude reached to get something out of the glove compartment he shot him in the head.

Q. Did he say who this guy was?

A. He didn't tell me no name.

Q. To this day do you know the guy's name?

A. No.  I don't know what he looked like or nothing.

Q. Okay.  Where did he say this happened?

A. In Houston in some apartment complex.

4

Q. Okay.  How did he tell you that he ended up with all the guns and drugs?

A. Because he said he shot the guy and he went back up in the apartment and got everything and put it in the car.

Q. So the guns-the guns and the drugs came from inside the apartment?

A. Yes.

Q. Were they [Appellant's] guns and drugs?

A. I'm assuming they was whoever that guy was up in there.

Appellant, Kee Kee, Courtney, and Joseph all participated in moving Melvyn's body from the trunk of Appellant's car to the shed.  They then consumed a considerable amount of the drugs that Appellant had taken from Melvyn.  The next morning, Kee Kee accompanied Appellant to a local Home Depot where Appellant purchased a chain saw, gloves, and trash cans.  Appellant planned to dispose of Melvyn William's body by dismembering it with the chain saw and throwing away the body parts so they could not be identified. But Joseph told his Aunt Wanda about the body and she contacted the authorities.  The police arrived before the victim's body was dismembered.  A police chase ensued, and Appellant, Joseph, Courtney, and Kee Kee were arrested.

Appellant's Version of Events

Appellant denied killing Melvyn.  He did know the victim, he knew Melvyn was a drug dealer, and he had partied with him.  At some point prior to the murder, Kee Kee, Wanda, and Shirley Tolliver visited Houston. Appellant took Kee Kee around the music scene and introduced him to Melvyn.  Kee Kee and Melvyn talked privately for over an hour, but Appellant did not know the details of the conversation.

Shortly before he disappeared, Melvyn asked Appellant for a ride to the Greens Point area on the north side of Houston. Appellant last saw Melvyn talking to some guys in a blue Caprice. Melvyn waved at Appellant to go ahead and leave. Appellant then went home, where he learned that his grandmother had become very sick in Fort Worth. He then threw some clothes in a bag and left. He arrived in Fort Worth around 4 or 5 p.m. that afternoon. He met Kee Kee at Wanda's house, and then allowed Joseph and Courtney to use his car. The two were gone approximately twenty to twenty-five minutes. Then Appellant, Kee Kee, Joseph, and Courtney drove to City View to his grandmother's apartment. Kee Kee asked to use Appellant's car. Kee Kee, Courtney, and Joseph left while Appellant stayed to visit his grandmother. Appellant testified that the three men were gone about two hours and that when they returned, he noticed that they had all changed clothes.

At around 9 or 10 p.m., Appellant and Kee Kee drove to Teleishea's house. According to Appellant, Kee Kee pulled a gun out while they were sitting at the table. They went into a back room to hide the gun, and Kee Kee revealed he had another gun and some prescription drugs. Appellant grabbed the guns and placed them in a box in the closet. While Appellant was panicking over the guns, Kee Kee pulled out a bag of cocaine from his pocket and snorted some off of a plate he had picked up in the kitchen. Appellant told Kee Kee to put all of his stuff on top of some boxes in the closet, and Appellant walked out of the room. The two then left for Wanda's apartment at City View.

Once Appellant and Kee Kee returned to Wanda's house, they discovered someone had broken into the garage and trashed Kee Kee's car. Appellant claimed he told Kee Kee to call the police, but Kee Kee told him not to worry about it. Appellant found this unusual. Kee Kee then asked Appellant to run him over to Home Depot, where Kee Kee bought some trash cans, a chain saw, and some gloves that Kee Kee said he needed to clean up the backyard. Appellant drove Kee Kee back to the Purington house and Kee Kee took the items out of

6

the car.  By now, it was early Friday, August 5, 2005.
Kee Kee asked to borrow Appellant's car, leaving
Appellant at the house.  According to Appellant, Kee
Kee was gone fifteen or twenty minutes.  Later,
Appellant and Kee Kee again ended up at City View where
Courtney's brother, Michael Howard, borrowed
Appellant's car.  Appellant then headed for Purington
in Michael Howard's car with Kee Kee and Courtney as
passengers.  When Appellant turned off of Lancaster,
Kee Kee suddenly asked him to stop.  Appellant parked
the car, and Kee Kee jumped out and ran toward the
backyard of a house.  After less than two minutes, Kee
Kee climbed into the car and told Appellant to drive
back toward Lancaster.  Shortly thereafter, Appellant
heard sirens.  Appellant slowed down and began to pull
to the right lane, but Kee Kee yelled, "Go, go, go."
When Appellant realized the police car wasn't going
around them and was instead following them, he asked
Kee Kee why the law was chasing them, and Kee Kee's
response was, "You don't want to know, man.  Just go.
Just go."  Appellant was concerned about leaving the
scene of an accident, but Kee Kee was yelling at him
and told him, "You better go.  They're going to charge
us all with murder."  Kee Kee told Appellant that he
was referring to Appellant's "homeboy" from Houston.

Appellant claims he still had no idea what Kee Kee
was talking about and didn't know anybody was dead
until Saturday, August 6, 2005.  Appellant panicked
when Kee Kee told him they were going to be charged
with murder, and he slammed on the brakes, hitting a
curb, causing the vehicle to flip over.

Mem. Op. 1-6, ECF No. 7-2.

## II.  Issues

One or more of Petitioner's claims are vague and/or

multitudinous and are addressed as thoroughly as practical.[1]

---

[1]In this federal petition, Petitioner did not fully apprise the court of
the legal arguments supporting his claims.  Instead, it appears he

Generally, Petitioner claims (1) ineffective assistance of trial counsel; (2) prosecutorial misconduct; (3) trial court error; (4) denial of counsel during a "critical stage of pretrial"; and (5) ineffective assistance of appellate counsel.  Pet. 6-7A, ECF No. 1.

### III.  Rule 5 Statement

Respondent believes that Petitioner has sufficiently exhausted his state court remedies as to the grounds raised and does not dispute that the petition is timely under the federal statute of limitations.  Resp't's Answer 9, ECF No. 15; 28 U.S.C. § 2244(b), (d).

### IV.  Discussion

*Legal Standard for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication:  (1) resulted in a decision

---

incorporates by reference the arguments raised in his state habeas application in case no. WR-76,891-02.  Because Petitioner is pro se, the Court liberally construes the petition as raising the same claims as those raised in and addressed by the state courts.  Any arguments raised for the first time in Petitioner's federal petition or his reply brief are not considered.  *Jones v. Cain,* 600 F.3d 527, 541 (5th Cir. 2010).

that was contrary to, or involved an unreasonable application of,
clearly established federal law, or (2) resulted in a decision
that was based on an unreasonable determination of the facts in
light of the evidence presented in the state court.  28 U.S.C. §
2254(d).  A decision is contrary to clearly established federal
law if the state court arrives at a conclusion opposite to that
reached by the Supreme Court of the United States on a question
of law or if the state court decides a case differently than the
Supreme Court has on a set of materially indistinguishable facts.
*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v.
Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court
decision will be an unreasonable application of clearly
established federal law if it correctly identifies the applicable
rule but applies it unreasonably to the facts of the case.
*Williams*, 529 U.S. at 407-08.

The statute further requires that federal courts give great
deference to a state court's factual findings.  *Hill*, 210 F.3d at
485.  Section 2254(e)(1) provides that a determination of a
factual issue made by a state court shall be presumed to be
correct.  The presumption of correctness applies to both implicit
and explicit factual findings.  *Young v. Dretke,* 356 F.3d 616,
629 (5th Cir. 2004); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11

9

(5th Cir. 2001) ("The presumption of correctness not only applies
to explicit findings of fact, but it also applies to those
unarticulated findings which are necessary to the state court's
conclusions of mixed law and fact.").  The petitioner has the
burden of rebutting the presumption of correctness by clear and
convincing evidence.  28 U.S.C. § 2254(e)(1).  Finally, when the
Texas Court of Criminal Appeals denies a federal claim in a state
habeas corpus application without written order, "it may be
presumed that the state court adjudicated the claim on the merits
in the absence of any indication or state-law procedural
principles to the contrary." *Johnson v. Williams,* 133 S. Ct.
1088, 1094 (2013); *Harrington v. Richter,* 131 S. Ct. 770, 784-85
(2011).

     In this case, the state habeas court entered express
findings of fact as to Petitioner's claims, which he has failed
to rebut with clear and convincing evidence, and the Texas Court
of Criminal Appeals adopted those findings, with the exception of
those relevant to ground three above, in part, and denied habeas
relief without written order.  Under these circumstances, a
federal court must defer to the state habeas court's factual
findings and may assume the Texas Court of Criminal Appeals
applied correct standards of federal law to the facts, unless

there is evidence that an incorrect standard was applied.
*Townsend v. Sain*, 372 U.S. 293, 314 (1963)[2] *Catalan v. Cockrell,*
315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274
F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d
162, 183 (5th Cir. 1997). With these principles in mind, the
court addresses Petitioner's claims.

> *Grounds One and Five: Ineffective Assistance of Counsel*

Petitioner claims he received ineffective assistance of
counsel at trial and on appeal. Petitioner was represented by
Danny D. Burns and Lawrence Patrick Davis at trial and R. Scott
Walker on appeal.

A criminal defendant has a constitutional right to the
effective assistance of counsel at trial and on a first appeal as
of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S.
387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688
(1984); *Anders v. California*, 386 U.S. 738, 744 (1967). An
ineffective assistance claim is governed by the familiar standard
set forth in *Strickland v. Washington*. 466 U.S. at 668. *See
also Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001)
(applying the *Strickland* standard to ineffective assistance

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C.
§ 2254(d). *Harris v. Oliver*, 645 F.3d 327, 330 n.2 (5th Cir. 1981).

claims against appellate counsel).  To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 688.

In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy.  *Id.* at 668, 688-89.  Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight.  *Id.* at 689.  Where a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state court record. *Harrington*, 131 S. Ct. at 785 (quoting *Williams v. Taylor*, 529 U.S. at 410); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

Under his first ground, Petitioner presents a laundry list of ineffective-assistance claims against trial counsel. Specifically, Petitioner alleges trial counsel Danny D. Burns was

12

ineffective by failing to—

    (1)    request a jury instruction on accomplice-witness evidence and object to improper jury charge;

    (2)    request a jury instruction on the definition of probable cause relevant to Petitioner's warrantless arrest and seizure of evidence;

    (3)    object to a misstatement of law in the jury charge;

    (4)    challenge/suppress fabricated evidence that was tampered with and planted at the scene nine days later;

    (5)    challenge/suppress tainted evidence seized upon Petitioner's illegal arrest without probable cause;

    (6)    introduce admissible impeachment evidence;

    (7)    conduct an adequate investigation;

    (8)    consult with Petitioner before testifying; and

    (9)    confer in private with Petitioner during pretrial.

Pet. 6, 7A, ECF No. 1.

In the state habeas proceeding, Burns, licensed to practice law since 1978, responded to Petitioner's allegations *via* affidavit as follows:

    Mr. Evans received an effective defense based upon the law and facts. I talked with Mr. Evans about the facts and the legal issues in his case. I talked with Mr. Evans about the facts of his case on at least four occasions and tried to discuss with him the problems involved in his story. Every time I ask[ed] him about a discrepancy or mentioned the State's conflicting

evidence, Mr. Evans would start screaming and yelling
that I was on the State's side and I just wanted to get
him convicted.  He kept telling me he knew how to set
up a writ to get him a new trial.  I told Mr. Evans
several times that he needed to help me develop his
defense and then we would not have to worry about a
writ if we could get him acquitted.  This did not
satisfy Mr. Evans.  I then tried listening to his
version and defensive suggestions and would read parts
of the State evidence to him but again this just
angered him.  He was intent on not addressing the flaws
in his story or helping me reject the State's version
of what happened.

   The allegation that I never prepped him to testify
is not true.  I went over his story with him at least
four times and tried to point out the holes.  When I
talked with Mr. Evans about whether he would testify, I
gave him the same advise [sic] I give to most of my
clients.  It has been my experience that more people
are acquitted sitting beside their lawyer rather than
sitting on the witness stand.  I told Mr. Evans it was
his absolute right to testify or not to testify.  No
one could call him to the stand against his will nor
could anyone keep him off the stand if he wanted to
testify.  I told Mr. Evans that if he told his story
and the jury believed him, it could help him.  If they
did not believe him, and that was a real possibility
because of the timing factors, the independent witness
whom he called on his way back from Houston, the jury
would convict him.  He decided to testify and he was a
good witness for the most part.  A witness, whether a
fact witness or a defendant, cannot be told what to
testify to except the truth.  If the defendant does not
wish to talk about the problems with his testimony, his
lawyer cannot make him listen.

   On the accomplice witness charge, I talked with
Mr. Evans in private about the charge after we received
the proposed charge from the Court reporter.  After we
talked about the pros and cons of the charge, Mr. Evans
agreed that we should not ask for the charge.  If I
recall correctly, Mr. Evans was in the Courtroom when I

14

told the court reporter that I did not want an
accomplice witness charge in this case. Judge Salvant
put the fact that I was not wanting the accomplice
witness charge on the record. I took a moment to
determine how to respond and what to say for the
record. The accomplice witness charge was not
consistent with our defense. An accomplice witness
instruction in this case would in fact have been
counter to the theory of the defense which was that Mr.
Patrick Evans did not commit the murder and had nothing
to do with the murder. An accomplice witness
instruction has a tendency to be misunderstood by some
jurors that the Judge believes the defendant is guilty,
if not as the primary actor in the murder, at least as
an accomplice but he cannot be convicted of the murder
he committed on the uncorroborated testimony of his
fellow murderers. The instruction provides:

    You are instructed that an "accomplice," as the
term is hereinafter used, means any person connected
with the crime charged, as a party thereto, and
includes all persons who are connected with the crime
as such parties, by unlawful act or omission on their
part transpiring either before or during the time of
the commission of the offense. A person is criminally
responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another
for which he is criminally responsible, or by both.
Mere presence alone, however, will not constitute one a
party to an offense.

    When one is contending that one did not commit the
murder, did not know that the murder had occurred until
it was an accomplished fact, to have an instruction to
the jury that the other parties are accomplices as a
matter of fact or law, will not help the defendant
unless there is no evidence that could corroborate
their testimony. In this case, the State could have
spent their entire closing argument talking about the
evidence that corroborated the accomplices testimony.
The substantial amount of blood in the trunk of Mr.
Evans' car, his telephone call to Wanda Williams that
he was returning from Houston, the short time which the

"accomplices" had to drive the car to Houston, kill Mr. Melvyn Williams and drive back to Tarrant County with the body.  The location of the dead body of Mr. Melvyn Williams, the bar-b-que with insufficient food for even one person, etc. etc.  The accomplice witness charge would have eliminated any chance Mr. Evans had at an acquittal.

In regards to the Officer approaching the vehicle and "ordered applicant out of the car, to be arrested." If there was a problem with the order, Mr. Evans cured that error by pulling off, speeding, and evading arrest.  There was no valid motion to suppress.

On the allegation that I did not request a definition of probable cause, I did not present an issue to the jury regarding probable cause to stop the car, because one, there was not a valid factual issue to be decided by the jury, and two, the presentation of a search or probable cause issue to a jury allows substantial hearsay, otherwise inadmissible, to be admitted to show probable cause existed.

Mr. Patrick Evans has no standing to object to Teleishea Johnson's consent to search, which according to her affidavit she never gave and she had no information relevant to Mr. Evans['] defense.

Mr. Evans never informed Counsel or his investigator that Fulton Toler would have any testimony that would be favorable to Mr. Evans nor that he would be an impeaching witness for Mr. Evans and Mr. Evans never provided any information to the defense as to what, if any information Fulton Toler had which would be either beneficial or aggravating for Mr. Evans.  He never told us that Mr. Fulton Toler had any information that could be used in his defense.

There was nothing in the crime scene in Houston that would be useful in the defense of Mr. Evans on this charge.  Mr. Evans points to no evidence that could have possibly be [sic] beneficial to his defense. I normally visit a crime scene, drive by, or if

16

possible go inside but the Houston home of Mr. Williams
was not going to be a crucial issue in Mr. Evans[']
trial.

In regards to . . . [Tolliver's] alleged financial
arrangement with the police and the fingerprint on the
trash bag, neither was sufficiently impeaching to
warrant their use in trial.  Tolliver had some traffic
warrants outstanding and he was not arrested on those
warrants at that time.  The fingerprint on the trash
bag proved nothing.  The minimal impeachment value
could well have been viewed by the jury as reaching for
straws.  The production of the murder weapon was much
more compelling in connecting Mr. Tolliver to the
murder.

Mr. Patrick Evans never gave me the phone numbers
nor the names of . . . [uncalled] witnesses except when
referencing the State's witnesses.  I asked for witness
names and what they could testify regarding each time I
saw him but he did not provide the witnesses he now
names.

A motion to suppress is used to attack
constitutional violations and credibility of testimony
is for the jury to determine.  The fact that witness
Joseph Tolliver and not Mr. Evans knew where the murder
weapon was and delivered the murder weapon to the
police actually fit the defense that Tolliver was the
killer and not Mr. Evans.  Mr. Evans did not have the
murder weapon not [sic] did he know where it was.

At the close of trial, I asked Mr. Evans if he was
satisfied with the defense we had presented and he was
very happy with the defense and said he was satisfied
with how we had presented his defense.  Mr. Evans said
at that time he had no complaints but did not want to
sign a statement to that effect.

I spent a lot of time with Mr. Patrick Evans, much
more than he claims, despite his insistence on yelling
and refusing to talk about the case or the police
reports.  Again, Mr. Patrick Evans was happy with our

17

defensive efforts after the trial was completed until
the jury returned a guilty verdict.

SH11b - writ, Attorney Aff., 259-65, ECF No. 10-12.

Davis also responded *via* affidavit, wherein he stated that
he served as second chair for observation purposes only, that he
informed Petitioner of his limited role, and that he did not
question any witnesses on direct or cross-examination.  He
further stated that Mr. Burns was wholly effective, and he
adopted Mr. Burns's response to Petitioner's allegations.  SH11c,
Attorney Aff. 283, ECF 10-13.

The state habeas court clearly found counsel's affidavits
credible, and supported by the record, and entered findings, too
numerous to list here, consistent with the affidavit, which were
largely adopted by the Texas Court of Criminal Appeals.  SH11c -
writ 324-30, ECF No. 10-13.  Based on those findings, and
applying the *Strickland* standard, and other relevant state and
Supreme Court case law, the state habeas court concluded that
counsel adequately and independently investigated Petitioner's
case, fully and adequately prepared for Petitioner's trial,
including filing pretrial motions and preparing Petitioner to
testify, exercised reasonable professional judgment in not filing
motions to suppress evidence obtained from Petitioner's arrest or

18

from Ms. Johnson's house, exercised reasonable professional judgment in not requesting an accomplice-witness instruction or an instruction on probable cause, and functioned as counsel guaranteed by the Sixth Amendment. *Id.* at 331. The court further concluded that given the following evidence there was no reasonable probability that the jury would have reached a different verdict with other counsel or if counsel had represented Petitioner in a different manner:

     a.    Petitioner knew the victim and knew that he was a drug dealer;

     b.    Petitioner telephoned Mercutio Howard and told him he was on his way to Fort Worth with "a body in the trunk";

     c.    Petitioner told Howard and Joseph Tolliver that he "hit a lick," meaning that he took something from someone or robbed them;

     d.    Petitioner told Howard that, after he shot the victim, he returned to his apartment to steal his guns and drugs;

     e.    Petitioner detailed to Howard how he murdered and robbed the victim by shooting him in the head;

     f.    Petitioner arrived in Fort Worth with a large amount of marijuana, cocaine, prescription drugs and various guns;

     g.    Petitioner enlisted Howard, Tolliver and Courtney Davis to help him remove the victim's body from the trunk of his car to a storage shed;

     h.    Tolliver and Howard testified how the four of them

19

moved the body from Petitioner's car to the shed;

I.  Petitioner planned to dispose of the body by dismembering it with a chain saw and scattering the body parts;

j.  Petitioner and Howard went to Home Depot and purchased a chain saw;

k.  The police located the body inside the storage shed;

l.  The police retrieved the murder weapon from the storage shed;

m.  The police recovered biological evidence from Petitioner's car;

n.  Expert testimony determined that:

- "The deceased was the DNA profile contributor to the blood swab of the spare tire from the Appellant's trunk;
- The deceased was the DNA profile contributor to the scrapings obtained from the trunk of Appellant's Intrepid;
- The deceased was the DNA profile contributor to the murder weapon;
- The deceased was the DNA profile contributor as to the swab taken from the Dodge Intrepid seat belt loop; and
- The deceased was the DNA profile contributor as to the swabs taken from the seat belt and latch."

*Id.* at 329-30.

Deferring to the state court's findings, and having independently reviewed Petitioner's claims in conjunction with the record, the state court's application of *Strickland* was not

20

unreasonable.  Petitioner's claims are conclusory, with no legal
and/or evidentiary basis, refuted by the record, involve state
evidentiary rulings or other matters of state law, or involve
strategic and tactical decisions made by counsel, all of which
generally do not entitle a state Petitioner to federal habeas
relief.  *See, e.g., Strickland*, 460 U.S. at 689 (holding
strategic decisions by counsel are virtually unchallengeable and
generally do not provide a basis for post-conviction relief on
the grounds of ineffective assistance of counsel); *Johnson v.
Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (concluding that
counsel is not required to make futile motions or objections);
*Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere
conclusory allegations in support of a claim of ineffective
assistance of counsel are insufficient to raise a constitutional
issue."); *United States v. Green*, 882 F.2d 999, 1003 (5th
Cir.1989) (providing "[a] defendant who alleges a failure to
investigate on the part of his counsel must allege with
specificity what the investigation would have revealed and how it
would have altered the outcome of the trial"); *Alexander v.
McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective
assistance claims "based upon uncalled witnesses [are] not
favored because the presentation of witness testimony is

essentially strategy and thus within the trial counsel's domain,
and . . . speculations as to what these witnesses would have
testified is too uncertain"). Moreover, even if Petitioner could
demonstrate defective assistance based on one or more of his
claims, in view of the overwhelming evidence of his guilt, he
cannot make a showing of *Strickland* prejudice. *Strickland,* 466
U.S. at 694-96.

Petitioner claims appellate counsel, R. Scott Walker, was
ineffective by failing to file a proper brief raising one or more
of his issues on direct appeal and to file a motion for new trial
raising an ineffective-assistance-of-counsel claim based on trial
counsel's failure to request an accomplice-witness jury
instruction. Pet. 7A, ECF No. 1. Appellate counsel responded to
Petitioner's allegations, in relevant part, as follows:

> 2. Applicant has argued that I should have filed a
> motion for new trial claiming that Trial Counsel was
> ineffective for failing to obtain an accomplice witness
> instruction. Applicant states in his affidavit . . .
> that Applicant had told Appellate Counsel during the
> initial interview that Trial Counsel had failed to
> request an accomplice witness instruction and that he
> wanted Appellate Counsel to file a motion for new trial
> alleging ineffective assistance. Applicant argues that
> Appellate Counsel was ineffective for failing to do so.
> These allegations are not factual. It is true that at
> the initial interview that I asked Mr. Evans if he was
> aware of any problems in the trial that I might look
> into before filing a brief. I routinely ask this
> question at the initial interview. However, Mr. Evans

22

said nothing about the failure of Trial Counsel to
request an accomplice witness instruction.  I have
renewed my notes from the initial interview.  I listed
the things conveyed to me by Applicant relating to
possible problems that occurred during the trial.
There is nothing about accomplice witness instructions.
I had no information at my disposal that would indicate
any need to file a motion for new trial.

3.   Applicant also argued that I should have made the
argument which is delineated above in the direct
appeal.  I did not do so because I did not feel that
such and [sic] argument was sustainable.  The
accomplice witness testimony was sufficiently
corroborated.  The victim's partner, who was not an
accomplice, testified that Appellant had told him that
he was with the victim prior to the murder.  A chain
saw and gas can was found which corroborated the
accomplice witnesses' testimony that the Appellant
planned to dismember the body with the chain saw and
then burn the body.  Appellant also testified in the
trial.  He admitted that he had been with the victim
prior to the murder.  Applicant also stated in his
affidavit . . .,

> "Affiant wrote Mr. Walker asking why he
> didn't make the accomplice testimony an issue
> on direct appeal.  Affiant received a letter
> saying, you don't raise this issue on direct
> appeal you have to have jurors to testify
> during a hearing."

This is also a misstatement.  The letter I wrote to him
was not in response to a question concerning accomplice
testimony. . . .

4.   Applicant also argued that I should have argued
that Trial Counsel was ineffective for failing to
object to a misstatement of law in the jury charge and
for failing to object to a misstatement of the law to
the voir dire by the State.  I did not do so because I
did not feel that such and [sic] argument was
sustainable.  First, I did not believe Trial Counsel's

failure to do so was wrong.  Second, even if it had
been wrong, Trial Counsel's actions were most likely
reasonable trial strategy.

5.   Applicant also argued that I should have argued
that Trial Counsel was ineffective for failing to
request a jury instruction on the definition of
probable cause.  Again, this was most likely reasonable
trial strategy.  I believe the stop was not illegal.
Police had information about the body prior to the
stop.  A police chase insued [sic].  Appellant wrecked
the vehicle.  Furthermore, even if the stop had been
illegal, only evidence obtained as a result of the stop
would have been suppressed.  The vast majority of the
evidence presented at trial was not obtained pursuant
to the stop.  The record certainly did not provide any
indication to me that there was an illegal stop or
search and that Trial Counsel should have requested a
probable cause instruction.

6.   I do not argue appeal points that are not
sustainable when I have good appeal points to argue.
In this case, I had some very good issues to argue on
appeal.  This is evident by the fact that two of the
Court of Criminal Appeal's [sic] Judges voted to grant
the PDR.  I argued the strong points.

SH11b - writ 244-45, ECF No. 10-12.

The state habeas court entered factual findings consistent

with counsel's affidavit and concluded that appellate counsel

exercised reasonable professional judgment in deciding not to

file a motion for new trial and in determining which issues to

raise on direct appeal.  SH11c - writ 342-44, ECF No. 10-13.  The

state court's application of *Strickland* was not unreasonable.  As

a matter of Texas law, an application for state habeas relief is

the more appropriate vehicle to raise an ineffective-assistance

claim. *Rylander v. State,* 101 S.W.3d 107, 110 (Tex. Crim. App.

2003). Additionally, as noted by the state court, appellate

counsel is not required to raise every conceivable argument urged

by his client on appeal, regardless of merit. *Smith v. Robbins,*

528 U.S. 259, 287-88 (2000). It is counsel's duty to choose

among potential issues, according to his or her judgment as to

their merits and the tactical approach taken. *Jones v. Barnes,*

463 U.S. 745, 749 (1983). Petitioner fails to raise any

meritorious claims in this petition. Prejudice does not result

from appellate counsel's failure to assert meritless claims or

arguments. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th

Cir. 1994). Thus, it follows that counsel was not ineffective

for failing to raise one or more of Petitioner's claims on

appeal.

### Ground Two: Prosecutorial Misconduct

Petitioner claims the state engaged in prosecutorial

misconduct by knowingly presenting or failing to correct the

false testimony of Joseph Tolliver that he had no connection to

the murder weapon or the plastic bag containing the murder

weapon, by intimidating Teleisha Brown to give false testimony

with threats of CPS involvement and felony prosecution, and by

25

vouching for the credibility of its witnesses during voir dire.
Pet. 6, ECF No. 1; RR, vol. 2, 93, ECF No. 8-1.  Relying solely
on state law, the state habeas court entered the following
findings of fact relevant to this claim:

11. The applicant alleges that Joseph Tolliver falsely
    testified that he had no connection with the bag
    containing the murder weapon.

12. Joseph Tolliver returned to the shed several days
    after they moved the deceased's body.

13. Joseph Tolliver knew that the murder weapon was in
    the shed.

14. Joseph Tolliver picked up the bag containing the
    murder weapon to look inside it.

15. Joseph Tolliver's testimony is not inconsistent
    with the presence of his fingerprints on the bag
    containing the murder weapon.

16. Joseph Tolliver did not present false testimony
    regarding the bag containing the murder weapon.

17. The State did not fail to correct any false
    testimony by Joseph Tolliver.

18. The applicant alleges that the State coerced a
    witness into giving false testimony by threatening
    felony charges and involvement by Child Protective
    Services (CPS).

19. Teleisha Johnson states that she was coerced into
    letting the police search her home.

20. Ms. Johnson states that she was coerced into
    speaking with the prosecutors by threats of felony
    charges and CPS involvement.

21.  Ms. Johnson states that her attorney, the Hon.
     Leon Haley, told her that she would face felony
     charges if she did not speak with the prosecutor.

22.  At trial, on examination by Mr. Haley, Ms. Johnson
     testified that Mr. Haley had advised her that
     talking to the prosecutors was her choice.

23.  The trial court gave Ms. Johnson the choice
     whether to speak to the prosecutor before
     testifying.

24.  Ms. Johnson agreed on the stand to speak to the
     prosecutor before testifying.

25.  Ms. Johnson's claim that she was coerced into
     speaking with the prosecutor is not credible.

26.  Ms. Johnson was called as a witness by the
     defense.

27.  The State impeached Ms. Johnson with her prior
     inconsistent statements regarding the revolver
     recovered from her house.

28.  The State did not coerce false testimony from Ms.
     Johnson.

29.  The applicant alleges that the State improperly
     vouched for the credibility of its witnesses.

30.  During the voir dire examination, the prosecutor
     made the following statement:

     *The State puts on the witnesses we have,
     provided we believe they're credible.*

31.  The Court of Appeals held that the prosecutor's
     voir dire statement did not have a substantial or
     injurious effect on the jury's verdict.

32.  The prosecutor's voir dire statement was not
     misconduct.

> 33.    The State did not engage in prosecutorial
>        misconduct.

SH11c - writ 300-02, ECF No. 10-13 (record references omitted).

*See also* Mem. Op. 11-14, ECF No. 7-2.

The state court's adjudication of the claim is neither

contrary to Supreme Court precedent nor unreasonable based on the

evidence before the court.   Petitioner's first two claims are

refuted by the record and, even assuming the prosecutor's comment

was improper, it was harmless in the face of overwhelming

evidence of Petitioner's guilt.   *United States v. Hasting,* 461

U.S. 499, 511-12 (1983).

### Ground Three: Trial Court Error

Petitioner claims the trial court erred by failing to

instruct the jury on accomplice-witness testimony.   Pet. 7, ECF

No. 1.   Petitioner asserts that the state's opening comment that

it "will bring . . . accomplice testimony, accomplice witnesses

who were helping the Defendant dispose of the body" and that the

jury's "confusion" regarding the testimony of Tolliver and Kee

Kee during deliberations should have alerted the trial court to

the necessity of an accomplice-witness instruction.   SH11a -

writ, 10, ECF No. 10-11.   However, the accomplice-witness rule is

a state law.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West

2005).[3]  It is "not mandated by common law of the federal
constitution." *Blake v. State,* 971 S.W.2d 451, 454 (Tex. Crim.
App. 1998).  Thus, a determination by a state court that a
defendant is not entitled to relief for the omission of a jury
instruction on the accomplice-witness rule precludes federal
relief on this issue.[4]  *Id.  See also Schaetzle v. Cockrell,* 343
F.3d 440, 449 (5th Cir. 2003) ("It is not our function as a
federal appellate court in a habeas proceeding to review a
state's interpretation of its own law, and we defer to the state
courts' interpretation of the Texas . . . statute." (internal
citations omitted)).  Furthermore, as emphasized by counsel and
the state court, any such instruction would have been contrary to
the defensive strategy.

Petitioner also claims the trial court violated his right to

---

[3]The statute provides:

> A conviction cannot be had upon the testimony of an
> accomplice unless corroborated by other evidence tending to
> connect the defendant with the offense committed; and the
> corroboration is not sufficient if it merely shows the commission
> of the offense.

[4]The state habeas court found that the trial court did not include an
accomplice-witness instruction because Petitioner did not request one but
nevertheless concluded that claims of jury-charge error were not properly
raised on writ of habeas corpus. SH11c 335, ECF No. 10-13.  It is not clear
whether the Texas Court of Criminal Appeals, which did not adopt the trial
court's findings on this issue, adjudicated the claim on the merits or deemed
it procedurally barred in state court.  Given this court's disposition of the
claim, however, the issue is irrelevant.

confrontation by preventing him from questioning Joseph Tolliver regarding his polygraph examination.  Pet. 7, ECF No. 1.  During defense counsel's cross-examination of Tolliver, the following exchange took place regarding Tolliver's negotiated plea for a probated sentence in his tampering-with-evidence case:

> Q.  Part of your [plea] deal is that you would have to – have to testify truthfully; is that correct.
> A.  Yes.
> Q.  Who would determine if you were testifying truthfully?
> A.  *I took a polygraph test on the questions that they asked.*

RR, vol. 4, 137-38; ECF No. 9-1 (emphasis added).

According to Petitioner, Tolliver's reference to a polygraph biased the jury against him, while giving weight to Tolliver's testimony and leaving the jury with the impression that Tolliver had been exonerated of the murder, and opened the door for defense counsel to question Tolliver about the questions he was asked during the polygraph.  SH11a - writ 9, 39, ECF No. 10-11.  The state habeas court, relying solely on state law, found that, although the issue was not cognizable on state habeas review, the trial court properly prevented further questioning of Tolliver regarding his polygraph examination and entered the following legal conclusions:

> 5.  If an open-ended question gives a witness the

30

opportunity to support the truthfulness of his
answers, the witness may take advantage of the
opening and respond to the question, so long as
the witness does not exceed the scope of the
invitation provided by the question.

6.   A party cannot seek to impeach a witness by
prompting or soliciting a misleading response to a
collateral matter on cross-examination.

7.   A party may not bootstrap an impeachment attempt
if the collateral matter involved is initially
elicited by a party during cross-examination of
the witness.

8.   Joseph Tolliver's answer did not open the door for
defense counsel to delve into the identity of the
polygraph examiner and to test his qualifications
– facts irrelevant to the issues at trial, and,
therefore, collateral or immaterial matter.

SH11c - writ 333-34, ECF No. 10-13 (citations omitted).

Petitioner has not demonstrated that the state court's

adjudication of his claim violates Supreme Court precedent or

resulted in a decision based on an unreasonable determination of

the facts based on the record before the court.   The Sixth

Amendment guarantees a defendant the right "to be confronted with

the witnesses against him," which includes the right to conduct

reasonable cross-examination.   U.S. CONST. amend. VI; *Olden v.*

*Kentucky,* 488 U.S. 227, 231 (1988).   It has long been the rule in

Texas however that polygraph evidence is generally inadmissible

for all purposes.   *Nethery v. State,* 692 S.W.2d 686, 700 (Tex.

Crim. App. 1977); *Tennard v. State,* 802 S.W.2d 678, 683 (Tex.
Crim. App. 1990). Moreover, the Confrontation Clause "is
satisfied where sufficient information is elicited from the
witness from which the jury can adequately gauge the witnesses'
credibility." *United States v. Burke*, 738 F.2d 1225, 1227 (11th
Cir. 1984). In Petitioner's case, the trial court's limitation
of cross-examination did not violate his confrontation rights,
given that the trial court allowed defense counsel to cross-
examine Tolliver about responses he gave during the polygraph
exam; Petitioner failed to demonstrate what more he could have
gained by further questioning Tolliver on the subject of the
polygraph; and the defense had other more relevant evidence with
which to discredit Tolliver–specifically, Tolliver's plea
agreement to a probated sentence in exchange for his testimony
against Petitioner and Tolliver's prior inconsistent statements
regarding the events that occurred on or about August 5, 2005.
RR, vol. 4, 141, 145, ECF No. 9-1; *King v. Trippett*, 192 F.3d
517, 524 (6th Cir. 1999); *Insyxiengmay v. Morgan,* 245 Fed. Appx.
693, 2007 WL 2409422, at *1 (9th Cir. Aug. 22, 2007), *cert.
denied,* 552 U.S. 1234 (2008). The limitation did not leave the
jury without sufficient information to evaluate Tolliver's
credibility.

Finally, Petitioner claims the trial court violated his confrontation rights by admitting a statement made by a nontestifying witness.   Pet. 7, ECF No. 1.   The state appellate court addressed this claim as follows:

### SIXTH AMENDMENT CONFRONTATION CLAUSE

In Point of Error Four, Appellant challenges the admission of a statement made by a non-testifying witness which denied Appellant's right of confrontation.   The State responds that Detective McCaskill's testimony was not "testimonial."

#### *Relevant Facts*

During trial, Detective McCaskill testified that Wanda Williams and Shirley Tolliver came to his office to speak to him.   During this meeting, he learned there was a body in a storage shed behind Wanda's home. Defense counsel immediately objected to hearsay and denial of confrontation.   The court overruled the objection and allowed Detective McCaskill to proceed.

#### *Confrontation Clause*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."   In *Crawford v. Washington*, the Supreme Court held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."   541 U.S. 36, 53-4 (2004).   The Supreme Court held that only "testimonial statements" caused the declarant to be a "witness" within the meaning of the Confrontation Clause.   *See id.*, at 51.

In *Davis v. Washington,* the Supreme Court

clarified the distinction between testimonial and
nontestimonial statements:

> Without attempting to produce an exhaustive
> classification of all conceivable statements-
> or even all conceivable statements in
> response to police interrogation-as either
> testimonial or nontestimonial, it suffices to
> decide the present cases to hold as follows:
> Statements are nontestimonial when made in
> the course of police interrogation under
> circumstances objectively indicating that the
> primary purpose of the interrogation is to
> enable police assistance to meet an ongoing
> emergency.  They are testimonial when the
> circumstances objectively indicate that there
> is no such ongoing emergency, and that the
> primary purpose of the interrogation is to
> establish or prove past events potentially
> relevant to later criminal prosecution.

547 U.S. 813, 822 (2006).

Crawford involved tape recorded statements by a
declarant made during a police interview while Davis
involved a 9-1-1 call by the declarant detailing a
domestic violence dispute.  The declarant's
interrogation in Crawford took place hours after the
events she described, but the declarant in Davis spoke
about events as they actually occurred.  The Supreme
Court noted that any reasonable listener would
recognize that the declarant in Davis was facing an
ongoing emergency and that the questioning was
necessary to resolve it.  Davis, 547 U.S. at 823.  This
included the operator's effort to establish the
identity of the assailant, so that the dispatched
officers might know whether they would be encountering
a violent felon.  Id.  Finally, the court noted the
difference in formality between the interviews of the
Davis and Crawford declarants.  Davis, 547 U.S. at 827.
In Crawford, the declarant responded calmly at the
station house to a series of questions, with the
officer-interrogator taping and making notes of her

answers. *Id.* In *Davis,* the declarant's answers were
provided over the telephone, in an environment that was
neither tranquil nor safe. *Id.*

We also find guidance in *Langham v. State,* 269
S.W.3d 108, 113 (Tex. App.-Eastland 2008, pet.
granted). There, a detective was allowed to testify
concerning information provided by a confidential
informant. The informant was not "bearing testimony"
or making "[a] solemn declaration or affirmation made
for the purpose of establishing or proving some fact"
necessary to the criminal prosecution in the case.
*Id., citing Crawford,* 541 U.S. at 51. Instead, the
primary purpose was to provide sufficient information
to the detective so that he could obtain a search
warrant. *Id.* These statements were admissible because
they were nontestimonial. *Id.* at 114.

Appellant contends this is a classic case of an
ongoing emergency because any questioning by Detective
McCaskill was conducted to enable police officers to
render assistance. The State counters that the two
women did not attempt to recount the crime, neither
knew what had actually transpired, and they did not
implicate Appellant. We agree that the statements were
nontestimonial. Wanda and her sister simply relayed
information to Detective McCaskill after the shocking
discovery of a dead body at Wanda's home. *Davis v.
Washington,* 547 U.S. 813 (2006). They did not
implicate Appellant in any way. Finding no error, we
overrule Point of Error Four.

Mem. Op. 14-16, ECF No. 7-2.

The state court's adjudication of the claim is not an

unreasonable application of *Crawford* and other Supreme Court

precedent on point nor an unreasonable determination of the facts

presented. *Crawford* is inapplicable for two reasons: First, for

the reasons cited by the state court, the undersigned agrees that

the statements made by Wanda Williams and Shirley Tolliver to the detective were nontestimonial and therefore not subject to the holding in *Crawford*.   Second, Wanda Williams, the owner of the Purington residence and the only one of the two who actually saw the body before reporting it to the police, testified for the prosecution at trial and was available for cross-examination. *Crawford*, 541 U.S. 36, 53-57 (2004).

   *Ground Four: Denial of Right to Counsel at Critical Stage*

   Petitioner claims he was denied his Sixth Amendment right to counsel during pretrial proceedings, a critical stage of his criminal prosecution.   Pet. 7, ECF No. 1.   More specifically, he asserts he was denied counsel upon his initial appearance when bail was set at $500,000.   SH11a - writ 13, ECF No. 10-11.   The state habeas court addressed the claim and entered the following relevant factual findings:

   1.   On August 11, 2005, the complaint against the applicant was filed and the trial court set his bond at $500,000.

   2.   On August 17, 2005, the trial court appointed Mr. Burns to represent the applicant in this criminal matter.

   3.   The trial court appointed Mr. Burns within a reasonable time after the applicant's Sixth Amendment right to counsel attached.

SH11c 345, ECF No. 10-13 (record citations omitted).

36

Based on its findings, and applying the Supreme Court's
decision in *Rothgery v. Gillespie Cnty.*, 554 U.S. 191 (2008), the
state court entered the following legal conclusions:

> 1.   A criminal defendant's Sixth Amendment right to
>      counsel attaches when he is first brought before
>      the magistrate, informed of the accusations
>      against him, and sent to jail until bail is
>      posted.
>
> 2.   In Texas, a criminal defendant's Sixth Amendment
>      right to counsel attaches at his Article 15.17
>      hearing.
>
> 3.   Once a criminal defendant's Sixth Amendment right
>      to counsel attaches, counsel must be appointed
>      within a reasonable time to allow for adequate
>      representation at any critical stage both before
>      an at trial.
>
> 4.   The trial court's appointment of Mr. Burns was
>      within a reasonable time after the applicant's
>      Sixth Amendment right to counsel attached.

*Id.* at 345-46 (citations omitted).

*Rothgery* held that the Sixth Amendment right to counsel
attaches at an initial appearance before a judicial officer and
that counsel must be appointed (or the defendant must be given
the opportunity to retain counsel) within a reasonable time
*thereafter.*   554 U.S. at 194.   It did not hold that such an
appearance is a critical stage of a criminal proceeding.   *Id.* at
211-12 (noting that a defendant is entitled to counsel during any
"critical stage" of the *postattachment proceedings,* which

37

includes "any critical stage before trial, as well as at trial itself"). Therefore, there is nothing unreasonable about the state court's application of *Rothgery* or in its determination of facts in light of the evidence.

In summary, the record supports the state courts' denial of the claims presented in this federal habeas proceeding. The state courts' adjudication of the claims is not contrary to or involve an unreasonable application of clearly established federal law, as determined by the Supreme Court, in light of the record as a whole. Accordingly, it is entitled to deference and the presumption of correctness.

For the reasons discussed herein,

The court ORDERS the petition of Petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as

Petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED January _____5_____, 2015.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE